# EXHIBIT I

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PRISON TERMS

In the matter of the Life )
Term Parole Consideration )        CDC Number B-83314
Hearing of:               )
                          )
CHARLES LEWIS             )
_____)

COPY

RECORDS

CALIFORNIA MEDICAL FACILITY

VACAVILLE, CALIFORNIA

SEPTEMBER 15, 2004

8:42 A.M.

PANEL PRESENT:

SHARON LAWIN, Presiding Commissioner
CHUCK WOLK, Deputy Commissioner

OTHERS PRESENT:

CHARLES LEWIS, Inmate
JOHN STRINGER, Attorney for Inmate
KATHERINE COEHLO, ADA Coordinator, Observer
ERMENDEZ, Observer
TAMMY GOOCH, Observer
SHERIDAN CRITE, Observer

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____  No      See Review of Hearing
_____  Yes     Transcript Memorandum

Patricia Ricci          Capitol Electronic Reporting

ii

## INDEX

|  | Page |
|---|---|
| Proceedings | 1 |
| Case Factors | 16 |
| Pre-Commitment Factors | 23 |
| Post-Commitment Factors | 42 |
| Parole Plans | 36 |
| Closing Statements | 58 |
| Recess | 61 |
| Decision | 62 |
| Adjournment | 69 |
| Transcriber Certification | 70 |

--oOo--

1

1      P R O C E E D I N G S

2          DEPUTY COMMISSIONER WOLK:  Testing, testing,

3      testing, testing.  We're on record.

4          PRESIDING COMMISSIONER LAWIN:  Thank you.

5      This is a Subsequent Parole Consideration Hearing

6      for Charles Lewis, CDC number B-83314.  Today is

7      September 15th, 2004.  We're located at CMF.  The

8      time is 8:42.  Mr. Lewis was received in CDC on

9      November 18th, 1977, from San Francisco, case

10     number 95226, and he was received for violation of

11     Penal Code Section 187, that's murder first, count

12     number one.  And that's with prior felony

13     convictions.  Terms of seven years to life.

14     Minimum eligible parole date July 12th, 1984.  Mr.

15     Lewis, as you know these hearings are tape

16     recorded.  For voice ID we're going to go around

17     the table and identify our voices for the

18     transcriber.  Each of us will state our first and

19     last name, spell our last name.  When we come to

20     you I need for you to do that plus give us your CDC

21     number.  I'll begin and go to my right.  Sharon

22     Lawin, L-A-W-I-N, Commissioner.

23         DEPUTY COMMISSIONER WOLK:  Chuck Wolk,

24     W-O-L-K, Deputy Commissioner.

25         ATTORNEY STRINGER:  John Stringer,

26     S-T-R-I-N-G-E-R, attorney for Mr. Lewis.

27         INMATE LEWIS:  Charles Lewis, L-E-W-I-S,

2

1    B-83314.

2        MS. COEHLO:  Katherine Coehlo, C-O-E-H-L-O,

3    ADA Coordinator, CMF.

4        MS. ERMENDEZ:  (Inaudible.)

5        PRESIDING COMMISSIONER LAWIN:  I'm sorry,

6    you have to speak up.

7        MS. ERMENDEZ:  (Indiscernible) Ermendez,

8    Board of Prison Terms.

9        PRESIDING COMMISSIONER LAWIN:  And spell

10   your last name.

11       MS. ERMENDEZ:  E-R-M-E-N-D-E-Z.

12       MS. GOOCH:  Tammy Gooch, G-O-O-C-H, Board of

13   Prison Terms, observer.

14       MR. CRITE:  Sheridan Crite, C-R-I-T-E, Board

15   of Prison Terms, observer.

16       PRESIDING COMMISSIONER LAWIN:  Thank you.

17   That identifies all parties in the room with the

18   exception of two correctional peace officers, and

19   they are here for security purposes.  Mr. Lewis,

20   the last time you signed a BPT 1073 Form was on

21   September 3rd, 2004, and on that form it asked if

22   you have any disabilities as defined by the

23   Americans with Disabilities Act.  You indicated

24   that you do have a disability, that your disability

25   is seeing.  The ADA Coordinator reviewed your

26   request for accommodation.  Although the request

27   states visual aids, optical device, and attorney,

3

1    the ADA Coordinator on a 1073A indicated that you

2    claim a seeing disability and have requested an

3    attorney and visual machine as accommodations.    Per

4    CDC 1845 dated 5/13/98 you are permanently vision

5    impaired.  In addition CDC 128(c) dated 4/25/01

6    indicates you use a Kurzweil, K-U-R-Z-W-E-I-L,

7    Reading Machine and or Optelec, O-P-T-E-L-E-C,

8    Magnifier.  Your request was granted.    It reads

9    your claimed disability has been verified.  Based

10   on the above information you will be assigned an

11   attorney as an accommodation to represent you and

12   you may use a Kurzweil Reading Machine and or

13   Optelec Magnifier if available.  Otherwise an

14   equally effective visual aid will be provided.

15   Originally that was signed on January 10th, 2003,

16   and updated September 2004.  Now we do have the

17   Optelec machine in front of you and I noticed that

18   you did turn it on, so it looks like it's ready to

19   go.  And I tested it earlier.  I turned it on to

20   make sure that it was working.  And you have your

21   attorney.  Are there any other accommodations that

22   you require in order to fully participate in the

23   hearing?

24          INMATE LEWIS:  No.

25          PRESIDING COMMISSIONER LAWIN:  I see you

26   have glasses in front of you.  Are you able to

27   utilize glasses?

4

1          INMATE LEWIS:  Sometimes.

2          PRESIDING COMMISSIONER LAWIN:   Sometimes.

3          INMATE LEWIS:   Reading glasses.   They are

4    some very heavy reading glasses (indiscernible)

5    yes.

6          PRESIDING COMMISSIONER LAWIN:   Okay so

7    sometimes you can use your glasses, and other times

8    you use the magnifier?

9          INMATE LEWIS:   Depending on how large the

10   print, yes.

11         PRESIDING COMMISSIONER LAWIN:   All right.

12   Did you have any difficulty arriving at the hearing

13   room here today?

14         INMATE LEWIS:   None, no.

15         PRESIDING COMMISSIONER LAWIN:   Do you have

16   any loss of hearing?

17         INMATE LEWIS:   No.

18         PRESIDING COMMISSIONER LAWIN:   Are you

19   taking any medication?

20         INMATE LEWIS:   Yes.

21         PRESIDING COMMISSIONER LAWIN:   Will that --

22   First of all, have you taken that medication today?

23         INMATE LEWIS:   Yes.

24         PRESIDING COMMISSIONER LAWIN:   And will it

25   enable you to function in the hearing today?

26         INMATE LEWIS:   No, it's just blood pressure.

27         PRESIDING COMMISSIONER LAWIN:   Okay, so it

5

1    wil~~t~~ not disable you or cause you not to be able to

2    participate?

3            INMATE LEWIS:   No.

4            PRESIDING COMMISSIONER LAWIN:   And I read in

5    the file you're not a part of Triple CMS or EOP.

6    Is that still correct?

7            INMATE LEWIS:   This is correct.

8            PRESIDING COMMISSIONER LAWIN:   Counsel, any

9    comments regarding ADA?

10           ATTORNEY STRINGER:   No, I believe all

11   accommodations have been made to my client by the

12   Board, Commissioner.

13           PRESIDING COMMISSIONER LAWIN:   Thank you,

14   Mr. Stringer.   All right, Mr. Lewis, the purpose of

15   our hearing today is to consider your suitability

16   for parole.   In arriving at our decision we're

17   going to consider the crime that brought you to

18   prison, your background, your social history, and

19   your behavior since your incarceration.   We're

20   going to go to your progress since your last

21   hearing and will do that by utilizing the

22   Counselor's Report, the Psychological Report, and

23   any other information that has a bearing on your

24   suitability.   We have reviewed your Central Files

25   and prior hearing transcripts, and we'll give you

26   and Mr. Stringer the opportunity to make

27   corrections and clarifications to the record as we

6

1    go. Both of you will also have the opportunity to

2    provide any clarification or make corrections to

3    the record as we go along as well.  And you're

4    going to have the opportunity to make a closing

5    statement.  This goes to your suitability for

6    parole and length of confinement.  The law and the

7    Board of Prison Terms' Rules state that in reaching

8    our decision today we're to consider whether or not

9    your release would pose an unreasonable risk of

10   danger to others.  You are not required to discuss

11   the commitment offense with the Panel.  You are not

12   required to admit to the offense.  And if you

13   choose not to speak to the Panel about the crime,

14   the fact that you're not talking about it will not

15   be held against you.  The Panel does accept as true

16   the court's findings.  That means we're not here

17   today to retry your case.  Our purpose is to decide

18   only on your suitability for parole.  Besides

19   protection under the Americans with Disabilities

20   Act you are afforded a number of other rights for

21   this hearing, and they include the right to a

22   timely notice, the right to present relevant

23   documents, and the right to do an Olson Review.

24   Mr. Stringer, have those rights of your client's

25   been met thus far to the best of your knowledge?

26        **ATTORNEY STRINGER:**  I am going to have an

27   inquiry as to relevant documents, but as to the

7

1    other items you indicated, yes.

2         PRESIDING COMMISSIONER LAWIN:   Thank you.

3    One additional right you have, Mr. Lewis, is to a

4    fair and impartial Panel.  Now that you have

5    learned the identity of the Panel Members, do you

6    have any objections to the members of the Panel?

7         ATTORNEY STRINGER:  We have one inquiry,

8    Commissioner, and that is I know the Board can't

9    always comply with this regulation, but at times,

10   at least one of the Commissioners or Deputy

11   Commissioners that sat in on the original hearing

12   is usually assigned to the subsequent hearing, and

13   that hasn't occurred in this case.  And I'm

14   inquiring why that is.

15        PRESIDING COMMISSIONER LAWIN:   Well, if

16   you're talking about the original hearing, we're

17   going back to --

18        ATTORNEY STRINGER:  When I talk about the

19   original hearing I'm talking about the hearing that

20   he was granted, April (indiscernible).

21        PRESIDING COMMISSIONER LAWIN:   Well that's

22   not exactly an original hearing.  You're talking

23   about his last actual hearing?

24        ATTORNEY STRINGER:  Yes.

25        PRESIDING COMMISSIONER LAWIN:   The Board

26   makes every effort to have duplicate or the same

27   Commissioners.  I happen to have sat on his Panel

8

1    in 2000, so I am someone who has sat on his Panel

2    before.  But the Board is not able to provide the

3    same Panel Members as the 2001 hearing.

4         ATTORNEY STRINGER:  But it was not the

5    granting Panel.

6         PRESIDING COMMISSIONER LAWIN:  What was not?

7         ATTORNEY STRINGER:  The Panel that you sat

8    on.

9         PRESIDING COMMISSIONER LAWIN:  That's

10   correct.

11        ATTORNEY STRINGER:  Whereas there are no

12   either Commissioners or Deputy Commissioners

13   present today from the granting Panel.

14        PRESIDING COMMISSIONER LAWIN:  That's

15   correct.

16        ATTORNEY STRINGER:  And that's what I,

17   that's my inquiry.  Why is that?  Because I think

18   he's entitled to at least have somebody that found

19   him suitable before.

20        PRESIDING COMMISSIONER LAWIN:  Well, he's

21   not necessarily entitled to it.  In fact the Penal

22   Code says the Board will attempt, and the Board

23   attempted to do that and were unable to do so for

24   whatever reason.  I don't do scheduling, so I can't

25   tell you the specific reasons.  But the Board makes

26   every attempt to do that where possible.

27        ATTORNEY STRINGER:  Then just to preserve

9

1    the record, I'm going to object.

2             PRESIDING COMMISSIONER LAWIN:  To what?

3             ATTORNEY STRINGER:  To the Panel, that the

4    Panel does not have one Commissioner here that was

5    here for the decision when he was granted parole.

6             PRESIDING COMMISSIONER LAWIN:  Your

7    objection is noted and overruled.  The question

8    goes to whether or not Mr. Lewis believes that this

9    Panel can be fair and impartial.  Are there any

10   objections regarding our ability to be fair and

11   impartial?

12            ATTORNEY STRINGER:  No.

13            PRESIDING COMMISSIONER LAWIN:  Thank you.

14   Will your client be speaking with us today?

15            ATTORNEY STRINGER:  Commissioner, because my

16   client has taken full responsibility for the crime

17   in the past and because this is the 15th Subsequent

18   Hearing, actually the 17th hearing, he's going to

19   elect not to speak about the life crime.  However,

20   if there are any questions that the Board has that

21   are relative to suitability that the Board really

22   wants answered, certainly I can discuss that with

23   him.

24            PRESIDING COMMISSIONER LAWIN:  All right.

25   Will he be speaking to us about other issues such

26   as parole plans and post-conviction?

27            ATTORNEY STRINGER:  He will.  He will.

10

1       PRESIDING COMMISSIONER LAWIN:   Thank you.

2   Then if you'd raise your right hand as best you can

3   I'll swear you in.   Do you solemnly swear or affirm

4   that your testimony at this hearing will be the

5   truth, the whole truth, and nothing but the truth?

6       INMATE LEWIS:   I do.

7       PRESIDING COMMISSIONER LAWIN:   Thank you.

8   Mr. Lewis, you're going to receive today a copy of

9   the tentative written decision.   Regardless of what

10  that decision is, it's tentative until it goes

11  through the Board's decision review process.   After

12  they have completed their review a final copy is

13  sent to you as it has been in the past, along with

14  a copy of the transcript from this hearing.   The

15  Regulations that previously allowed you to file an

16  appeal on Board of Prison Terms' Decisions were

17  repealed effective May 1st, 2004.   There is now a

18  process in place where you can file a grievance on

19  certain aspects of our decision and you can find

20  that process outlined in an Administrative

21  Directive.   It would be AD04 slash 01, and you

22  should be able to locate that in the prison law

23  library.   Commissioner, is there any confidential

24  to be used today?

25      DEPUTY COMMISSIONER WOLK:   No, there is not.

26      PRESIDING COMMISSIONER LAWIN:   Thank you.

27  And Mr. Stringer, I do have a copy of the Documents

11

1  Checklist I'd like for you to look at and make sure

2  that you received the same documents.

3       ATTORNEY STRINGER:  I do have those,

4  Commissioner, but I am going to inquire about the

5  Board Report.

6       PRESIDING COMMISSIONER LAWIN:  The Board

7  Report.  We have a Board Report that was prepared

8  for his last scheduled hearing.  It's dated January

9  2003, and then Addendums, which are the post-

10 conviction progress report dated July 27th, 2004.

11 Those should be the most recent.

12      ATTORNEY STRINGER:  I have those.  What

13 concerns me, Commissioner, is if the Board was to

14 grant Mr. Lewis a date and it did go to the

15 Governor for review, it would seem to me that

16 someone could make the argument that the Board

17 Report is incomplete.  Can we stipulate that the

18 Board Report is complete for all purposes,

19 including review by the Governor if so warranted?

20      PRESIDING COMMISSIONER LAWIN:  Well, you can

21 stipulate that if you like.

22      ATTORNEY STRINGER:  I mean, can the Board

23 stipulate?  Will the Board stipulate that?

24      PRESIDING COMMISSIONER LAWIN:  That it is

25 complete, no, because we don't prepare it.  We will

26 be utilizing the information that is contained in

27 here and we will determine what weight we give it

12

1  and what information is pertinent as we go through

2  the hearing.  But I can't stipulate to something

3  that I didn't prepare.

4       ATTORNEY STRINGER:  I don't want to get Mr.

5  Lewis into an administrative trap here in that if

6  this was to go to the Governor that they will say

7  this isn't, the Board Report isn't in the usual

8  format that Board Reports are in.  It is simply an

9  Addendum.

10       PRESIDING COMMISSIONER LAWIN:  I understand

11  your concern.  This is the normal process we use

12  when there is a postponement however.  A new Board

13  Report is not prepared, not a full narrative.  The

14  update is the Post-Conviction Progress Report

15  Addendum, and that's the process that we've been

16  utilizing for years when there are postponements.

17  So this isn't anything unusual, and I haven't seen

18  in the recent, under the administration of Governor

19  Schwarzenegger, I haven't seen any reference to

20  outdated Counselor's Report in any of his

21  reversals.  I don't know if that's an issue or not.

22  I can understand your concern, but this is the

23  normal practice.

24       ATTORNEY STRINGER:  Okay.  And then finally

25  I will have one procedural objection to place on

26  the record.

27       PRESIDING COMMISSIONER LAWIN:  Okay.  First,

13

1    any new documents for our review?

2        ATTORNEY STRINGER:  No Commissioner.

3        PRESIDING COMMISSIONER LAWIN:  All right.

4    Your objection?

5        ATTORNEY STRINGER:  Commissioner, it is our

6    position that in fact the hearing on Mr. Lewis sits

7    here before you today is in fact, for all practical

8    purposes, a rescission hearing and that the Board

9    would have to establish that the previous date that

10   was taken by Governor Davis was in fact an

11   improvident grant of parole.  Under Title 15,

12   Section 2270, subsequent hearings are defined as

13   those hearing that occur after denials.  This

14   hearing is not occurring after a denial and in fact

15   is occurring because former Governor Davis

16   rescinded my client's parole date.  The Board

17   action was to grant him a parole date.  Therefore,

18   it is our position that unless the Board can

19   demonstrate that the original decision by

20   Commissioners Angele and Iniguez was somehow an

21   improvident grant of parole under principles of

22   res adjudicata, the Board would have to reaffirm

23   and grant that date.

24       PRESIDING COMMISSIONER LAWIN:  The

25   Governor's reversal is allowed and we'll have to

26   take a recess so that I can pull out the

27   appropriate Penal Code Sections, but it is

14

1    certainly allowed.   It is a different process than

2    a rescission hearing.   It is separate and totally

3    apart from a rescission hearing.  The Governor has

4    the authority to reverse any Board of Prison Terms'

5    Decisions.  Our decisions are tentative.  The

6    rescission hearing is a different process that's

7    held when the Governor either refers the case en

8    banc to the Board or the Board for whatever reason

9    refers it en banc and chooses to send a grant to a

10   rescission hearing.  This is not a rescission

11   hearing.  This hearing is considered a subsequent

12   hearing because it follows the reversal of the

13   Governor, again which is allowed by law, and

14   therefore reverts back to a denial and we are here

15   today to do a subsequent parole consideration

16   hearing.

17        ATTORNEY STRINGER:  Except that the Board,

18   even though the original decision was tentative,

19   the Board approved it.

20        PRESIDING COMMISSIONER LAWIN:  Yes, they

21   did.

22        ATTORNEY STRINGER:  It was then sent to the

23   Governor.  So I'm, what my argument is is that as

24   far as the Board is concerned, I'm not quarreling

25   that the Governor has the right to do what he did.

26   What I'm saying is the Board, the whole Board,

27   approved the original tentative decision,

15

1    therefore, that decision is res adjudicata as to

2    the Board and that this in fact, unless the Board

3    can demonstrate that there is some new evidence or

4    something has changed between the time of the grant

5    of parole and this hearing that the Board would

6    have no choice under the law but to ratify what the

7    previous Board has done.

8            PRESIDING COMMISSIONER LAWIN:  All right,

9    we'll take a recess.

10                        [Off record.]

11           PRESIDING COMMISSIONER LAWIN:  All right,

12   we're back on record in the hearing for Charles

13   Lewis and all parties have returned to the room.

14   Mr. Stringer, in regards to your objection to this,

15   Panel conducting a subsequent parole consideration

16   hearing and your belief that it should be a

17   rescission hearing, I'm going to overrule it, if I

18   hadn't already.  And specifically because the

19   Governor's reversal is essentially a rescission of

20   the parole date.  Section 2270 states that at this

21   hearing each prisoner who has previously, who was

22   previously denied, and he was denied parole by

23   Governor Davis' reversal of the grant.  Therefore

24   we are here to conduct the next step, which is a

25   subsequent parole consideration hearing to

26   determine Mr. Lewis' suitability today.  We are not

27   here to conduct a rescission hearing.  As I said,

16

1    the Governor essentially did that by reversing the

2    Board's grant.

3        ATTORNEY STRINGER:  Just to preserve the

4    record, that language does not specify the Governor

5    but does indicate that it's Board action and the

6    Board has approved a date.

7        PRESIDING COMMISSIONER LAWIN:  Actually it

8    doesn't.  The 2270 as I just read it specifically,

9    I just read as it begins.

10       ATTORNEY STRINGER:  But those are BPT Regs.

11       PRESIDING COMMISSIONER LAWIN:  Absolutely,

12   they are.  2270 Subsequent Parole Hearings, A,

13   General.  At this hearing each prisoner who was

14   previously denied parole shall be reconsidered for

15   parole in the same manner as at the initial parole

16   hearing.  The hearing Panel shall consider the same

17   information considered at the initial parole

18   hearing and any information developed since the

19   last hearing.  That's A, and then it goes on to B,

20   C, D, and so forth.  So we are here to conduct that

21   subsequent hearing.  Any further objections?

22       ATTORNEY STRINGER:  Ready to proceed,

23   Commissioner.

24       PRESIDING COMMISSIONER LAWIN:  Okay, I'm

25   going to take the Statement of Facts from the

26   hearing of the, or rather the Decision of the

27   hearing held on June 29th, 1983, and read that into

17

1    the record.  That would be pages two through four.

2    Any objection, Mr. Stringer?

3         ATTORNEY STRINGER:  And would that be

4    quoting the Probation Officer's Report, correct?

5         PRESIDING COMMISSIONER LAWIN:  The Statement

6    of Facts comes from that as well as Police Incident

7    Report as it relates on page two.

8         ATTORNEY STRINGER:  No objection.

9         PRESIDING COMMISSIONER LAWIN:  Thank you.

10   Under Statement of Facts,

11             "The Police Incident Report relates

12             that at 12:15 a.m. on September 26th,

13             1976, the nude body of a white male

14             identified as victim Gary Hasznos,

15             H-A-S-Z-N-O-S, was found in a parking

16             lot at Candlestick Park.  The body

17             had multiple abrasions and cuts from

18             the top of the head down to the feet,

19             front and back, and on his

20             extremities.  The lethal injury was

21             either a single or multiple blow,

22             blows, to the back of the head on the

23             left side.  There was also a stab

24             wound on the left side of the chest

25             which had entered the lung.  The

26             doctor stated that death resulted

27             from the head injuries and the stab

18

1    wound.   The prisoner and crime

2    partner Colvert, C-O-L-V-E-R-T, --

3    and I will just interject that the

4    first name is Jeffrey Colvert -- were

5    arrested on April 16th, 1977, for the

6    murder of the victim on September

7    26th, 1976.   The victim, the prisoner,

8    and the crime partner had

9    participated in an armed robbery

10   three days prior to the murder of the

11   victim.   On, excuse me, at five p.m.

12   on September 23rd, 1976, crime partner

13   Colvert and the victim had entered

14   the Odyssey Head Shop, Hayward,

15   California, where the owner, Tony

16   Silva, S-I-L-V-A, was working.   The

17   prisoner and his crime partner left

18   the store and about an hour later the

19   owner heard a noise in the rear of

20   the shop.   In the rear of the shop

21   the owner was confronted by the

22   prisoner who pistol-whipped him and

23   demanded money.   The prisoner shot

24   victim Silva in the shoulder and

25   covered his head with a blanket.   The

26   prisoner went to the front of the

27   store where victim Silva states he

19

1    heard crime partner Colvert's voice.

2    Prisoner returned to victim Silva and

3    took his wallet which contained over

4    1000 dollars.  The prisoner and his

5    crime partner left the store.  As

6    they were leaving the prisoner and

7    his crime partner were seen by

8    witnesses.  The prisoner was arrested

9    on October 26th, 1972 -- which is

10   incorrect, it should be 1976.  Crime

11   partner Colvert was arrested November

12   23rd, 1976.  According to the Alameda

13   County Record, the third person

14   involved in the robbery of the victim

15   had informed the Sheriff's Office

16   regarding crime partner Colvert and

17   the prisoner being involved in the

18   robbery.  The prisoner pled guilty to

19   the robbery on March 29th, 1977, and

20   was sentenced to prison on May 10th,

21   1977.  Additionally, the Probation

22   Officer's Report, POR, showed several

23   witnesses had testified to the

24   prisoner arriving at a cousin's home

25   in San Francisco around midnight on

26   September 25th, 1976.  Around nine

27   p.m. the crime partner Colvert and

20

1       —   the victim arrived.  Later that night

2        tussling noises were heard and the

3        two cousins said they saw the victim

4        and the crime partner struggling.

5        The cousins demanded the victim be

6        removed from their house and later

7        said they saw the victim leave out

8        the back door with the prisoner and

9        crime partner, Colvert, one at each

10       side of the victim."

11   And I'll conclude the Statement of Facts there.

12   There is an additional paragraph which indicates

13   the inmate's position at the time that particular

14   hearing was held.  And that also comes almost

15   verbatim from the Probation Officer's Report

16   beginning at page four, the Report that I just

17   read.  There is further information contained in

18   the various Counselor's Reports over the years.  I

19   will note that Mr. Lewis about a dozen years ago,

20   about 12 years ago, took responsibility for his

21   actions.  Prior to that apparently, this according

22   to prior transcripts, he had denied participation

23   in the murder of the victim and then about 1980,

24   '82, he took responsibility for his actions and

25   indicated that his prior statements were based on

26   his appeals and court actions at the time.  There

27   is a current Prisoner's Version in the January 2003

21

1  Counselor's Report.  And it reads,

2          "Approximately 10 years ago Lewis

3          accepted full responsibility for his

4          actions which led to the murder of

5          Gary Hasznos.  He is sincerely

6          remorseful.  He admits to being

7          involved in a physical altercation

8          with the victim.  However his main

9          regret is not preventing the incident

10          from escalating to murder.  When

11          asked why he did not initially admit

12          to his responsibility in the murder,

13          Lewis states he was concerned it

14          would interfere with current legal

15          process at that time."

16  Also I will refer the reader of the various

17  transcripts to the last hearing of 2001 where the

18  crime itself was discussed at length with Mr.

19  Lewis.  Commissioner Angele asked him numerous

20  questions about the specifics of the evening and

21  what had transpired.  It was a lengthy discussion

22  or questioning.  And the Panel has reviewed that

23  and has the opportunity to utilize that as well as

24  prior decisions and transcripts from prior hearings

25  in our deliberations today.  One thing that's

26  important I think, Mr. Stringer, for the Panel to

27  hear is how Mr. Lewis feels about the crime today.

22

1    Is that a question that you would allow?

2        ATTORNEY STRINGER:   I would, Commissioner.

3        PRESIDING COMMISSIONER LAWIN:   All right.

4    Mr. Lewis, can you tell us today how you feel about

5    what you did?

6        INMATE LEWIS:   You know I've had a lot of

7    time, 28 years, to think about it.  And it's

8    shameful, I mean, when I think in terms of what I

9    allowed myself to do as a person that was

10   considered to be somewhat intelligent.  I had a

11   family and I had a lot of other responsibilities,

12   and the fact that I could do the kinds of things

13   that I did at that time is deeply disturbing.  And

14   I never stop thinking about it.  I mean the fact

15   that when I talk to others of my ilk and they seem

16   to talk about it in such casual ways that for it

17   not to be something that creates a lot of

18   resentment and dishonor and, you know, the fact

19   that a lot of us can live with it without a lot of

20   remorse is disturbing to me.  But now, that's my

21   thinking now.  I can't say this has always been the

22   case, but at this point in my life when I look back

23   at what I've done, even now I mean I'm emotional

24   just thinking about what I've allowed myself, what

25   I've done in the past.

26       PRESIDING COMMISSIONER LAWIN:   And

27   specifically, I'm talking about the death of Mr.

23

1   Hasznos.

2        INMATE LEWIS:  This is what I'm talking

3   about, the fact that I could take another life and

4   continue to go about my daily business, that's

5   disturbing.  I wanted to at one point try and

6   contact his family and tell them how I felt about

7   it.  It was suggested that I get in contact with

8   some unit that is sponsored by the State.  And they

9   suggested that since the family has never responded

10  to any of the notifications of my Board hearing

11  that it would be best that I would leave it alone,

12  that I should not bother this family to tell them

13  how I felt about what I've done and to beg their

14  forgiveness.  I deeply regret what I've done.  I ,

15  deeply regret it.

16       PRESIDING COMMISSIONER LAWIN:  All right,

17  thank you.  We're going to move on to your prior

18  history, Mr. Lewis.  And the reports indicate that

19  you were committed to Youth Authority for battery

20  in about 1958, that the next -- Well first of all,

21  how long were you in CYA, do you recall?

22       INMATE LEWIS:  About, I went two times and

23  totaling 14 months, four months and like 10 months.

24       PRESIDING COMMISSIONER LAWIN:  Two different

25  occurrences?

26       INMATE LEWIS:  Yes.

27       PRESIDING COMMISSIONER LAWIN:  What else

24

1    besides battery?

2        INMATE LEWIS:  That was it.  Fights in

3    school.

4        PRESIDING COMMISSIONER LAWIN:  Both times?

5        INMATE LEWIS:  Both times.

6        PRESIDING COMMISSIONER LAWIN:  Then in, it

7    looks like you had a pretty clean period of time

8    then between '58 and '66.  '66 shows up as your

9    Federal commitment for bank robbery.  Was it that

10   you were being a good citizen or you just didn't

11   get caught between '58 and '66?

12       INMATE LEWIS:  Basically I just didn't get

13   caught.

14       PRESIDING COMMISSIONER LAWIN:  Okay.  It

15   says that you went to Federal Prison.  You and two

16   crime partners had robbed Security First National

17   Bank July 21st, 1966.  You took about 2,068

18   dollars.  And then on the same date robbed again.

19   That was 8,700 dollars net.  You used two sawed off

20   shotguns and a revolver.  Now were those two

21   different banks or the same bank?

22       INMATE LEWIS:  Two different banks.

23       PRESIDING COMMISSIONER LAWIN:  How long were

24   you in Federal Prison?

25       INMATE LEWIS:  Four years and some months.

26       PRESIDING COMMISSIONER LAWIN:  Where was

27   that?

25

1          —   INMATE LEWIS:   Lompoc and (indiscernible).

2          PRESIDING COMMISSIONER LAWIN:   Okay.   Next

3    up it says that you had jail commitments for

4    statutory rape in 1961, robbery in 1966, and I'm

5    not sure if that's separate, that seems to be

6    separate from the Federal, and possession of

7    narcotics and solicitation to commit a felony in

8    1972.   All of that accurate?   It says these are

9    jail commitments?

10          INMATE LEWIS:   It sounds pretty accurate,

11   yes.   There might be some haziness around the

12   dates, but it's pretty accurate.

13          PRESIDING COMMISSIONER LAWIN:   Your CINI

14   shows the one-year jail for robbery in 1966, this

15   was out of Los Angeles.   Narcotics in '72.   Well

16   you actually had a 90 day observation in '66 for

17   the bank robbery?

18          INMATE LEWIS:   Yes.

19          PRESIDING COMMISSIONER LAWIN:   Is that

20   accurate?   And then you got 15 year, that was the

21   Federal, a 15-year sentence on the Federal bank

22   robbery.   And you were arrested then in '72 and

23   received one year county jail, one day suspended

24   for the soliciting to commit a felony.   And the

25   narcotics, it looks like it was prior to that in

26   '72, for which you received probation and county

27   jail time?

26

1          INMATE LEWIS:  Yes.

2          PRESIDING COMMISSIONER LAWIN:  It says that

3     you were acquitted of a murder charge in 1965, that

4     you had been at a birthday party, the victim was

5     intoxicated, went after you with a tire iron.  You

6     picked up a knife, stabbed the victim.  You were

7     found not guilty and it appeared you were acting in

8     self-defense.  Is that true?

9          INMATE LEWIS:  True.

10         PRESIDING COMMISSIONER LAWIN:  In 1976 you

11    and Jeffrey Colvert, crime partner, were accused of

12    beating an individual in the head with a gun and

13    shooting him in the arm, and that's the prior that

14    I indicated.  You actually were arrested for that,

15    first, correct?  And then were you released from

16    jail or out on bail and then the commitment offense

17    happened?

18         INMATE LEWIS:  It was found after a week

19    or so that I didn't have anything to do with it.

20    I was released in the interest of justice.

21    They found after taking paraffin tests and all

22    that.

23         PRESIDING COMMISSIONER LAWIN:  I'm sorry,

24    what tests?  The paraffin test did you say?

25         INMATE LEWIS:  Yes, paraffin; yes.  But I

26    actually didn't have anything to do with that but I

27    was arrested.

27

1          PRESIDING COMMISSIONER LAWIN:   Were you

2   involved in that?

3          INMATE LEWIS:   No.

4          PRESIDING COMMISSIONER LAWIN:   Not at all?

5          INMATE LEWIS:   Yeah, wait, I was involved

6   but I didn't shoot nobody.   I was in the house.

7          PRESIDING COMMISSIONER LAWIN:   In that case

8   this was at the Odyssey Head Shop?

9          INMATE LEWIS:   No, this was, occurred as a

10  result of some acquaintances.   I thought one of

11  them had taken something from me, a close friend of

12  mine.   I went to talk to him and I had another

13  associate with me, Mr. Colvert.   One thing led to

14  another and Mr. Colvert ended up shooting the guy,

15  or there was a shoot out involved (indiscernible).

16         PRESIDING COMMISSIONER LAWIN:   The victim in

17  that case survived?

18         INMATE LEWIS:   Yes, it was just a

19  superficial.

20         PRESIDING COMMISSIONER LAWIN:   All right, we

21  have, the Counselor writes, prior performance on

22  probation and or parole has been poor as evident by

23  involvement in criminal activities.   In 1958 he

24  served seven months for battery, was returned to

25  custody within a year for a parole violation.   He

26  was involved in a statutory rape in 1961 while on

27  CYA parole.   He was paroled from Federal commitment

28

1    on 6/17/71 and returned as a parole violator on

2    6/8/73 for solicitation to commit a felony.  He was

3    also on parole, rather Federal parole status when

4    he committed the commitment offenses.  Now the

5    other crime I'll read from the current Counselor's

6    Report, facts of the offense, that would be on page

7    two of the January 2003 Counselor's Report.  It

8    reads,

9            "Prior to the life crime Lewis and

10           Colvert were involved in the robbery

11           of the Odyssey Head Shop located in

12           Hayward, California.  On 9/23/76

13           Colvert and Hasznos entered the

14           Odyssey Head Shop for a short time

15           period.  Later on the same date, Tony

16           Silva, clerk of the establishment

17           heard noises in the rear of the

18           building and discovered Lewis.  Lewis

19           assaulted Silva and demanded money.

20           Lewis, excuse me, Silva was hit in

21           the face and head which knocked him

22           to the floor.  While in this position

23           Silva was shot through the left

24           shoulder.  The victim was assaulted

25           once again and dragged to the rear of

26           the building.  Lewis went to the

27           front of the building and Silva

29

1          overheard a conversation between

2          Lewis and Colvert.  Lewis

3          subsequently returned and took

4          Silva's wallet which contained 1,000

5          dollars in cash.  The prisoner's

6          version relative to that crime, Lewis

7          admits involvement in this offense.

8          Lewis stated he knew the victim and

9          had bought and sold marijuana from

10         him.  Lewis stated he was unemployed

11         and was persuaded to participate in

12         this offense by his crime partner.

13         He stated the shooting was

14         unintentional as the room was dark

15         and during the struggle the weapon

16         went off."

17     Quite a past, Mr. Lewis.

18         **INMATE LEWIS:**  Correct.

19         **PRESIDING COMMISSIONER LAWIN:**  Anything in

20     particular you attribute that to?

21         **INMATE LEWIS:**  There's quite a few things

22     but basically the fact that my world view at the

23     time was such, it was twisted.  My values were

24     turned upside down.  I think having grown up in a

25     rather permissive household, and I didn't, I

26     thought it was a great environment, but after a

27     long period of confinement and looking back, that

30

1    my grandparents were very permissive.  They did

2    allow me to do just about anything I wanted to do.

3    And I had an uncle, Henry Jackson, who stayed in

4    the pen and was somewhat a bad guy, and they would

5    use him as a model for me in terms of you're going

6    to end up just like your uncle.  Well I admired my

7    uncle and not having the wherewithal to understand

8    all the dynamics involved, I grew up to be a lot

9    like my uncle.  He got his high school diploma in

10   San Quentin.  I lived with him when I was in Los

11   Angeles.  I found myself following in his

12   footsteps.  I later as a result of being involved

13   in Transaction Analysis and other forms of therapy

14   I have found that often times without adults        ,

15   knowing it they put out mixed messages, without

16   somehow or other intending to.  When they tell kids

17   certain things or young people whose minds might

18   not be developed quite right, that they in fact are

19   enforcing the certain types of behavior.  And all

20   this came about as a result of all this long time

21   of confinement.  But I had no way of seeing all of

22   this at the time, but looking back I do see a

23   pattern.

24        PRESIDING COMMISSIONER LAWIN:  Well it says

25   that you were born in Texas and your parents

26   Christine Jackson and Caldwell Lewis?

27        INMATE LEWIS:  Yes.

31

1       PRESIDING COMMISSIONER LAWIN:  Your father

2    passed away when you were just a couple years old?

3       INMATE LEWIS:  I've never seen my father.  I

4    don't know where that information comes from.  I

5    have never known my father.  I have never seen my

6    father.  I have never even seen a picture.

7       PRESIDING COMMISSIONER LAWIN:  Okay, so you

8    were raised primarily by your maternal

9    grandparents?

10      INMATE LEWIS:  I made by first birthday in

11   San Francisco.  I was born in Dallas, Texas, but my

12   grandmother brought me to California within months

13   after my birth, yes.

14      PRESIDING COMMISSIONER LAWIN:  Your mother

15   was in your life sporadically.  Is that true?

16      INMATE LEWIS:  Yes.

17      PRESIDING COMMISSIONER LAWIN:  It says that

18   you, your mother had remarried, or had two

19   husbands.  She had married twice after you came to

20   California?

21      INMATE LEWIS:  Only once that I'm aware of.

22      PRESIDING COMMISSIONER LAWIN:  Once, okay.

23   And that's Mr. Hurd?

24      INMATE LEWIS:  Yes.

25      PRESIDING COMMISSIONER LAWIN:  H-U-R-D.  It

26   says that your grandparents were hard working busy

27   people.  They owned real estate and that you grew

32

1    up without close discipline.  This is from the

2    Psychological Evaluation.   Fair statement?

3         INMATE LEWIS:  Yes.

4         PRESIDING COMMISSIONER LAWIN:  Dropped out

5    of technical high school in the 11th grade.   And is

6    that -- You went to technical because you were in

7    trouble in regular high school?

8         INMATE LEWIS:  Oakland Technical High School

9    is one of the better high schools in Oakland.  I

10   didn't drop out in the 11th grade.  I went to

11   senior picnic and all those kinds of functions.  I

12   failed a class or two in the 12th grade, but no,

13   technical in this sense doesn't mean

14   (indiscernible).

15        PRESIDING COMMISSIONER LAWIN:   It's not a

16   continuation school?

17        INMATE LEWIS:  No.

18        PRESIDING COMMISSIONER LAWIN:  And you went

19   on to get your high school diploma.  Was that while

20   you were in Federal Prison?

21        INMATE LEWIS:  Yes.

22        PRESIDING COMMISSIONER LAWIN:  Then went on

23   to take college courses and we'll get into that in

24   a little bit during your post-conviction.  It says

25   that you married first when you were 19?

26        INMATE LEWIS:  Only time.

27        PRESIDING COMMISSIONER LAWIN:  Okay.  And

33

1 that was Elveane, E-L-V-E-A-N-E?

2     INMATE LEWIS: Elveane.

3     PRESIDING COMMISSIONER LAWIN: How long were

4 you married?

5     INMATE LEWIS: Thirty-eight years.

6     PRESIDING COMMISSIONER LAWIN: And you have

7 sons Manfred and Marcus?

8     INMATE LEWIS: Had sons. Marcus died in

9 '97, March 11th. March 9th, 1997, he was killed.

10     PRESIDING COMMISSIONER LAWIN: I'm sorry.

11 And Manfred?

12     INMATE LEWIS: Manfred, he will be 40 in

13 five days.

14     PRESIDING COMMISSIONER LAWIN: Are you still

15 in contact with him?

16     INMATE LEWIS: No, I lost -- My wife died in

17 '99, October 11th, '99, and maybe within a year or

18 so after my wife died me and my oldest son we found

19 ourselves estranged from each other. And I

20 understand why, but we're not in contact.

21     PRESIDING COMMISSIONER LAWIN: And it says

22 that your wife passed away from cancer?

23     INMATE LEWIS: Yes.

24     PRESIDING COMMISSIONER LAWIN: You worked as

25 truck driver? You did, worked as a truck driver?

26     INMATE LEWIS: Yes, I have.

27     PRESIDING COMMISSIONER LAWIN: At some point

34

1    worked as a clerk in a Drug King in Los Angeles?

2            INMATE LEWIS:  Yes.

3            PRESIDING COMMISSIONER LAWIN:  Also worked

4    as a counselor at the Seventh Step Foundation?

5            INMATE LEWIS:  Yes.

6            PRESIDING COMMISSIONER LAWIN:  And also says

7    you worked at Kline Bottle in Santa Barbara, which

8    is a halfway house.

9            INMATE LEWIS:  Community counseling center

10   in Santa Barbara, yes.

11           PRESIDING COMMISSIONER LAWIN:  Were these,

12   the folks that would attend these, were they at

13   risk youth, were they adults?  What was the

14   situation?

15           INMATE LEWIS:  Well in Santa Barbara we had

16   at risk youth and older clients that were confused

17   individuals or drug abusers, life abusers.

18           PRESIDING COMMISSIONER LAWIN:  And how were

19   you qualified to be a counselor?

20           INMATE LEWIS:  Well while I was in Marion I

21   lived in a therapeutic community and it was ran by

22   a psychiatrist, Dr. Roader, who founded a Federal

23   Hospital in North Carolina, Buckner.  But anyway,

24   he trained a bunch of us as lay counselors.  And so

25   I was sent to Lompoc to create a peer counseling

26   program.  And while I was in Lompoc a clinician got

27   me a job as a counselor in Santa Barbara, as a lay

35

1    counselor.  And from there to Seventh Step.  But I

2    was just a lay counselor.  I was not, I didn't have

3    formal education.  I was just, there was this push

4    at the time that you couldn't, a con couldn't con a

5    con, so to speak, and so they were employing people

6    like myself in that capacity because supposedly we

7    had a better grasp of the situation than those

8    coming out of school with no street knowledge.

9         PRESIDING COMMISSIONER LAWIN:  As far as

10   illegal drugs it says that you used cocaine,

11   heroin, and amphetamines while you were on the

12   streets.  Is that true?

13        INMATE LEWIS:  This is true.

14        PRESIDING COMMISSIONER LAWIN:  Around 1976,

15   were you still using these drugs?

16        INMATE LEWIS:  Yes.

17        PRESIDING COMMISSIONER LAWIN:  So while you

18   were a counselor you were still using?

19        INMATE LEWIS:  Yes.

20        PRESIDING COMMISSIONER LAWIN:  Any other

21   drugs besides what I mentioned?

22        INMATE LEWIS:  Alcohol.

23        PRESIDING COMMISSIONER LAWIN:  How long have

24   you been clean and sober?

25        INMATE LEWIS:  I stopped smoking and poking

26   in 1981.

27        PRESIDING COMMISSIONER LAWIN:  What led you

36

1    to that decision?

2         INMATE LEWIS:  It was a lot of things.  I

3    just got sick and tired of being sick and tired.

4    It just wasn't working any more.  It didn't make

5    any sense.

6         PRESIDING COMMISSIONER LAWIN:  Is there

7    anything else about your background that I didn't

8    mention that you would like for us to know?

9         INMATE LEWIS:  I think we've mostly covered

10   it.

11        PRESIDING COMMISSIONER LAWIN:  All right.

12   There is no information regarding your parole plans

13   contained in the Addendum.  It states, if Lewis is

14   to receive another release date, he indicates he

15   has received a residential placement opportunity at

16   the Support Living Program SLP.  The SLP is

17   connected to the Center on Juvenile and Criminal

18   Justice located at 1622 Folsom Street, San

19   Francisco, California 94103, telephone number (415)

20   621-5661, and is a part of the Bay Area Services

21   Network BASN.  The BASN is all nine counties of the

22   Bay Area.  An alternative plan is to reside with

23   his friend, Otis Stillwell, S-T-I-L-L-W-E-L-L, at

24   6158 Baker Street, Oakland, California 94608,

25   telephone number (510) 653-5016.  Another

26   alternative is to reside in a transitional home

27   offered through Faith Presbyterian Church, 430

37

1   dash, 430 49th Street, Oakland, California 94609,
2   telephone number (510)653-9752. Are those your
3   plans?

4          INMATE LEWIS: Yes.

5          PRESIDING COMMISSIONER LAWIN: I have a
6   number of letters to go through. The first is from
7   James V., as in Victor, Larkin, L-A-R-K-I-N, of Los
8   Gatos. He responds, or writes that he is a long-
9   time friend. That Mr. Lewis is a man of
10  gentleness, intelligence, and ability. He
11  encourages others and he encourages Mr. Larkin to
12  ask for our serious consideration for parole. It
13  goes on to talk about the relationship and Cairos
14  weekend spent together. It says that I have
15  continued to correspond with Charles through the
16  years. I lift up the giving of himself to grow by
17  attending various programs. I encourage you to
18  give him your serious thoughtful consideration and
19  grant him parole. Otis Stillwell --

20         [Thereupon, the tapes were turned over.]

21         DEPUTY COMMISSIONER WOLK: On record.

22         PRESIDING COMMISSIONER LAWIN: Ms. Stillwell
23  writes that they have known one another since
24  childhood. They went to elementary and high school
25  together. I am willing to help Charles in any way
26  I can. I have an extra bedroom and would gladly
27  extend the use of it to him. Charles wants to work

38

1    with troubled youth and our youth need all the

2    guidance they can get.  When a youngster is saved

3    from a life of crime by the telling of Charles'

4    experience, it will be a blessing to that family as

5    well as the human family.  Pastor Frank Jackson,

6    J-A-C-K-S-O-N, of Faith Presbyterian Church in

7    Oakland writes a support letter.  It states that he

8    is writing on behalf of the pastors of Oakland,

9    which he is the current secretary.  They're an

10   organization made up of clergy and community

11   leaders who are concerned about the issues within

12   the city.  They wrote to Mr. Lewis and said your

13   name came to my attention through my friend and

14   colleague, Reverend James Larkin, so this letter is

15   to let you know that we look forward to and welcome

16   your return to the community and will do all within

17   our resources and power to make the transition

18   meaningful and smooth.  Rashid Islam, Case Manager

19   of the Center on Criminal and, or rather Juvenile

20   and Criminal Justice, out of San Francisco writes a

21   letter indicating, as I already read, that they are

22   a home-like community.  They encourage greater

23   self-determination and community involvement.  It's

24   a program that lasts for 180 days, provides

25   individual counseling groups, meetings, links with

26   health, social, and vocational services.  That once

27   Mr. Lewis is paroled he will be accepted into the

39

1    SLP providing there is available bed space with

2    prior notice given.  Don and Marjorie, is it Lev?

3            INMATE LEWIS:  Yes.

4            PRESIDING COMMISSIONER LAWIN:  L-E-V, as in

5    Victor, write a support letter.  They say they have

6    a casual relationship with Mr. Lewis.  They visited

7    him over the years.  They offer to him a home base,

8    living with them in their home a half block off the

9    University of Washington campus in Seattle,

10   Washington.  And they state it is their home is

11   for, has six and one half bedrooms, two baths, and

12   has been altered to accommodate roomers.  Bus

13   service is close.  Now those are the current

14   letters that I have.  Did I miss any?

15           INMATE LEWIS:  I don't think so, no.

16           PRESIDING COMMISSIONER LAWIN:  Okay.  Now

17   the letter from the SLP, did they send you a

18   brochure as well that describes what the programs

19   are?

20           INMATE LEWIS:  Yes.

21           PRESIDING COMMISSIONER LAWIN:  And does that

22   talk about what you do besides attend groups?  In

23   other words, it's a live-in facility, correct?

24           INMATE LEWIS:  Yes.

25           PRESIDING COMMISSIONER LAWIN:  Do you work

26   outside or do you have the option of working

27   outside?  Is that available to you or not?

40

1    INMATE LEWIS: Yes. Shortly after I

2  received a date I was accepted into the San

3  Francisco, I was accepted at San Francisco State

4  University. I received a grant, okay. Now all

5  that's there because I didn't get out. I would

6  have enrolled in Spring of last year. One of the

7  things that, besides allowing me to stay there. My

8  wife she worked over 20, over a quarter of a

9  century. I have survivor benefits coming.

10    PRESIDING COMMISSIONER LAWIN: Right, from

11  Social Security.

12    INMATE LEWIS: From Social Security. Also

13  because of the fact that I have a disability

14  myself, and so one of the things that would happen,

15  there, they would help me to facilitate the

16  paperwork and all that.

17    PRESIDING COMMISSIONER LAWIN: They meaning

18  the SLP?

19    INMATE LEWIS: Right, okay. And Ms.

20  Marjorie and Don Lev, I would leave here with about

21  1400 dollars or so in my pocket. A phone call

22  would get me another additional 1000. So just in

23  order to make it until such time as I could get

24  something back, get started with Social Security

25  and disability and all that. And so I have several

26  friends out there I believe, and some relatives

27  that I think that would come around once I'm out

41

1   there.

2       PRESIDING COMMISSIONER LAWIN:   Okay, but you

3   would be living in the SLP?

4       INMATE LEWIS:   Right, but I would -- That's

5   in San Francisco.   But I would contact various

6   resources once I'm out there that are still

7   writing.   I'm still hearing from childhood friends

8   and all that, so yes, I would be living there, and

9   they provide besides therapeutic counseling, a

10  therapeutic environment, they also have job

11  counseling and medical, there's a medical arm.   It

12  appears to be a self-contained program where

13  everything that I would require is there.

14      PRESIDING COMMISSIONER LAWIN:   All right,

15  thank you.   And is substance abuse therapy included

16  in their program?

17      INMATE LEWIS:   Yes.

18      PRESIDING COMMISSIONER LAWIN:   It's a clean

19  and sober living environment?

20      INMATE LEWIS:   Yes.

21      PRESIDING COMMISSIONER LAWIN:   Anything else

22  about parole that we should know?

23      INMATE LEWIS:   It is true that in previous

24  attempts at parole I have not done very well.   And

25  mainly that's because that wasn't a goal of mine,

26  so to speak.   I still had some tendencies that for,

27  once my ship got off course, there's nothing that

42

1    -- I couldn't put it back on course.  I didn't have

2    the wherewithal.  I didn't have what it took.  And

3    so I'm one of those guys who I would not have done

4    this voluntarily.  I would not have come to a

5    penitentiary voluntarily.  But the fact that I have

6    has helped me to put my ship back on course and

7    that's how I will approach parole.  I now know what

8    I didn't know then.  And so I can't foresee -- This

9    could never be a part of my life again.  So I mean

10   as far as parole is concerned, I welcome it.

11           PRESIDING COMMISSIONER LAWIN:   Thank you.

12   We send out 3042 Notices.  That's a section of the

13   Penal Code that allows for those agencies that

14   participated in Mr. Lewis' case to respond and

15   provide their input regarding his suitability.  We

16   did not receive any written responses to those

17   notices.  And the DA, of course, is not here today.

18   We're going to move on, Mr. Lewis, now to post-

19   conviction.

20           DEPUTY COMMISSIONER WOLK:  Mr. Lewis, I'm

21   going to cover your programming primarily since

22   your last hearing.  I may overlap a little bit

23   farther into the past.  But I'm going to cover your

24   education, vocation, your self-help, therapy, and

25   your Counselor's and your Psychological Evaluation

26   Reports.  When I'm finished, if you have anything

27   to add, please do.  If you have any corrections to

43

1    make, feel free to do that as well.  It appears

2    that since you were received into the Department of

3    Corrections in 1977, you started programming almost

4    immediately.  And most significant I think was your

5    participation in the educational process, taking

6    college classes.  You did receive, as already

7    mentioned, you did receive your GED.  You've also

8    got an AA in education.  And your counselor states

9    that you're just a few credits shy of getting your

10   BA.  How many credits do you need?

11        INMATE LEWIS:  At the most 18 units.  I

12   think it's 15, but at the most it's 18 units.

13        DEPUTY COMMISSIONER WOLK:  And as you noted

14   also, you were accepted into the, was it San

15   Francisco State University?

16        INMATE LEWIS:  Yes.

17        DEPUTY COMMISSIONER WOLK:  And given a grant

18   to pursue your education there.  However, that at

19   this point, it is a moot point.

20        INMATE LEWIS:  Right.

21        DEPUTY COMMISSIONER WOLK:  Your current

22   assignment is as a teacher's aide for the visually

23   impaired in the vocational computer program.

24   You've been doing that since 1998.  You have

25   numerous laudatory chronos from your supervisors

26   regarding your work in that program.  Your

27   counselor also states that you're concurrently you

44

1  are participating in the ABE Disability Placement
2  Program.  She says that all of your grades have
3  been above-average to exceptional, that you display
4  a positive and motivated attitude and you're always
5  conscientious and courteous.  Prior to these job
6  assignments, you worked as a support services
7  warehouse clerk from 1992 to 1997.  And prior to
8  that some of your other assignments were as a
9  worker in the furniture factory.  You also have
10  received college credits from the college of Marin
11  and Solano Community College.  As far as your self-
12  help programming is concerned, you have worked as a
13  Pastoral Care Services Volunteer since 1997,
14  primarily caring for terminally ill and dieing      ,
15  patients.  One of the chronos that was written on
16  your behalf states, inmate Lewis has been a
17  Pastoral Care Services Volunteer since September
18  26th, 1997.  He has been an active member in this
19  program, providing comfort care to patients with
20  terminal illnesses.  He has been an advocate to the
21  sight impaired, providing to them large print
22  religious and reading materials.  He has also
23  facilitated their entrance into disability
24  placement programs.  We thank him for the many
25  hours he has volunteered in our program.  I believe
26  Mr. Lewis will continue to be a strong advocate for
27  the sight impaired wherever God leads him within

45

1    the institution or in free society.  And that was

2    written by Chaplain Noff (phonetic).  You also have

3    participated for quite some time in the VOLT

4    Program.  VOLT is a voluntary self-help group

5    comprised of inmates wishing to improve themselves

6    by learning to increase their concern and empathy

7    for the victims of violent crimes as well as to

8    achieve an understanding of the detrimental effects

9    of crime on victims, their families, and the

10    community as a whole.  This goal is achieved by

11    face to face meetings of VOLT members with various

12    community and victims' groups.  Inmate Lewis should

13    be commended for participation in this voluntary

14    self-help program.  In a Memorandum that was

15    written to the Board of Prison Terms by Wayne

16    Forbes, Supervisor, who supervised you while you

17    were a support services warehouse clerk, he states,

18    during the time, this time I found that Mr. Lewis'

19    attitude, conduct and work performance were

20    exceptional.  Inmate Lewis possessed leadership

21    qualities that I thought to be most impressive.  He

22    came into the assignment with an AA degree in

23    education and in spite of the fact that he was not

24    using that knowledge he thought it most important

25    to take on the responsibility of teaching,

26    training, and instructing new workers in their

27    respective job tasks.  I often found him speaking

46

1   to his fellow co-workers about the importance and
2   need for a good education.  I have always perceived
3   inmate Lewis to do the right thing.  In the face of
4   many personal tragedies he still managed to stay
5   focused on his goals.  If given the opportunity for
6   parole, I strongly believe he would be a very
7   positive and strong impact on the community.  Your
8   counselor prepared a report.  That's Counselor
9   Coehlo.  He states, among other things, that Lewis
10  maintains employable skills as a youth counselor,
11  horticulturist, landscaper, and most-recently
12  working with the visually impaired teaching
13  computer literacy and several different computer
14  programs.  He's also certified as an arc and
15  acetylene welder, has basic nursing skills, and
16  culinary and baking skills.  Considering the
17  commitment offense, prior record, and positive
18  institutional adjustment, it is my opinion that
19  Lewis would pose a low degree of threat to the
20  public if released at this time.  In a
21  Psychological Report that was prepared March of
22  2004 by Dr. Gary W. Collins, Clinical Psychologist,
23  Dr. Collins states, inmate Lewis' remarks were not
24  only goal oriented but diplomatic and suggested
25  good negotiating skill.  He has spent much of his
26  adult life in prison, but rather than succumb to
27  despair, he has made a careful appraisal of his

47

1   situation and hopes for an opportunity to function

2   effectively as a free person.  His intelligence and

3   apparent social judgment are above average.  Dr.

4   Collins diagnoses you, under Axis I as Poly-

5   Substance Abuse in Remission.  And under Axis II,

6   Anti-Social Personality Improved.  In his

7   assessment of dangerousness opinion, Dr. Collins

8   writes, Ms. Lloyd, a San Francisco Parole Officer,

9   wrote, the defendant is a complex human being.  He

10  possesses many positive characteristics.  He

11  appears to be above average in intelligence.  He

12  projects a warm, gentle demeanor and expresses a

13  deep concern and caring for his fellow human

14  beings.  He has maintained a marital relationship,

15  that has lasted more than 15 years.  More like 38

16  years, isn't it?

17       **ATTORNEY STRINGER:**  I think 15 at the time

18  that report was done.

19       **DEPUTY COMMISSIONER WOLK:**  In 2000?

20       **ATTORNEY STRINGER:**  The Probation Officer's

21  Report.

22       **DEPUTY COMMISSIONER WOLK:**  I see, it's still

23  quoting the probation officer?

24       **ATTORNEY STRINGER:**  Yes.

25       **DEPUTY COMMISSIONER WOLK:**  By all accounts

26  he's been a good father to his sons as well as a

27  substitute father for five neighbor youngsters.  As

48

1    verified by the defendant's Federal Parole Officer

2    Mr. Clint in the Alameda County Probation Report,

3    the defendant during the several years of his life

4    that he has been in prison has used the time to

5    acquire more education for himself, has also passed

6    on his knowledge to young inmates.  If past

7    criminal behavior alone predicted future re-

8    offense, one would conclude that Mr. Lewis is a

9    dangerous person.  But just as Ms. Lloyd wrote, Mr.

10   Lewis is a complex human being.  Despite the

11   availability of alcohol and drugs in prison, it has

12   been over 10 years since there is a record of Mr.

13   Lewis using any mind-altering drug.  Much of his

14   criminal behavior was associated with membership in

15   the drug dealing and using culture.  Mr. Lewis is a

16   challenging person to evaluate regarding recidivism

17   risk if he paroles.  He has a criminal history that

18   alone would predict a high risk of re-offense.  But

19   his behavior in prison for many years suggests that

20   if rehabilitation is possible for any felon, he

21   qualifies as a rehabilitated person.  As far as

22   your disciplinary history is concerned, what I was

23   able to find in these files consists of a

24   disciplinary in 1978 for fighting.  One in 1979 for

25   possession of stimulants and sedatives.  One in

26   1980 for possessing U.S. currency.  One in 1980 for

27   disobeying orders, and then the last one being in

49

1   1986 for possession of marijuana. There have been

2   no disciplinaries since that time that I can find.

3   You're to be commended for all of your positive

4   programming that you have done since you came to

5   prison and for your positive attitude. Do you have

6   anything to add to what I have already established

7   here?

8          INMATE LEWIS: I was, I'm currently a

9   teachers aide in ABE Two, Adult Basic Education

10  Two. I'm not with the visually impaired program,

11  VDP. That's a separate situation. But other than

12  that everything is correct basically. I don't have

13  anything to add.

14          DEPUTY COMMISSIONER WOLK: Thank you. Then

15  I'll turn it back over to Commissioner Lawin.

16          PRESIDING COMMISSIONER LAWIN: I didn't hear

17  mention of your attendance in AA, but I do see

18  chronos. Are you still attending?

19          INMATE LEWIS: Yes.

20          PRESIDING COMMISSIONER LAWIN: And I saw a

21  Meditation and Stress Reduction. Do you still

22  participate in that program?

23          INMATE LEWIS: No, that's been suspended.

24  The two coordinators, one of them died, Mrs.

25  Harris, she died and the doctor is not able to.

26          PRESIDING COMMISSIONER LAWIN: In our Board

27  packet there are a list of courses that you

50

1    attended.  One's dated 2002 and there are I think

2    30 different courses there.  And the other is 2003,

3    again 30 different courses.  Are all of these

4    relative to the Pastoral Care Services Program?

5           INMATE LEWIS:  Yes.

6           PRESIDING COMMISSIONER LAWIN:  And did you

7    take each of these, did you take the 30 courses in

8    2002 and then again in 2003?  Did you take them

9    over again?

10          INMATE LEWIS:  We have an ongoing training

11   every Monday of every week we have training, and so

12   I think that's what that's in reference to.

13          PRESIDING COMMISSIONER LAWIN:  Yes, that

14   makes sense.  The dates sort of follow that because

15   for instance in the 2002 listing, or 2003 listing I

16   have in front of me, you start out in January with

17   Conflict Resolution Through Conversational

18   Solutions and move through Hepatitis, Identifying

19   and Treating, Compassion, Fatigue, Tuberculosis,

20   Care for the Caregiver.  And the titles are similar

21   to the list in 2003, but slightly different.  And

22   it does look like they're weekly and sometimes

23   every couple of weeks.

24          INMATE LEWIS:  Right.

25          PRESIDING COMMISSIONER LAWIN:  Okay, so this

26   is, is this mandatory if you're participating in

27   the Pastoral Care Program that you're attending

51

1    these training sessions?

2        INMATE LEWIS:  Yes, to stay updated.

3        PRESIDING COMMISSIONER LAWIN:    And when

4    you're in that Pastoral Care Services Program you

5    are generally assigned to someone, is that

6    accurate?

7        INMATE LEWIS:  If someone is dieing we are

8    assigned as a vigils.  We have like eight hour

9    vigils where we sit -- The whole purpose of the

10   program is that nobody shall every die alone.  And

11   so we have someone to sit 24 hours a day until that

12   person leaves us.

13       PRESIDING COMMISSIONER LAWIN:   Are you

14   currently assigned to someone?

15       INMATE LEWIS:  No, there's no one currently.

16   We have so many PCS workers that I haven't sat

17   vigil in over a month.

18       PRESIDING COMMISSIONER LAWIN:   Well that's a

19   good thing.

20       INMATE LEWIS:  Right.

21       PRESIDING COMMISSIONER LAWIN:   Okay, as far

22   as your parole plans, your intention is to go back

23   to school?

24       INMATE LEWIS:  Yes.

25       PRESIDING COMMISSIONER LAWIN:   And you would

26   do that essentially full time, is that accurate?

27       INMATE LEWIS:  That's what I would like to

52

1  do. That's in a perfect world. That's what I

2  would like to do.

3      PRESIDING COMMISSIONER LAWIN: And I, and

4  going through the prior decisions, I always try and

5  make sure that everything is covered, and one of

6  the concerns had been that you didn't have an

7  employment offer. But you are legally, are you

8  considered legally blind at this point?

9      INMATE LEWIS: Yes.

10      PRESIDING COMMISSIONER LAWIN: So you have a

11  qualifying disability under Social Security?

12      INMATE LEWIS: Yes.

13      PRESIDING COMMISSIONER LAWIN: And we did,

14  as previously mentioned, have a notice of your

15  receiving, ability to receive benefits. Okay, and

16  there is a chrono dated 6/26/01 stating that you

17  were legally blind at that point. And you've had

18  some surgery, and I understand your vision has

19  improved?

20      INMATE LEWIS: Yes.

21      PRESIDING COMMISSIONER LAWIN: Let's see

22  what else is of concern. It looks like that's it.

23  Any questions, Commissioner?

24      DEPUTY COMMISSIONER WOLK: How long have you

25  been in AA or NA?

26      INMATE LEWIS: Ever since the late '70s,

27  '78, '79, '80, somewhere around there.

53

1        DEPUTY COMMISSIONER WOLK:  Have you worked

2    the steps?

3        INMATE LEWIS:  I've worked five of them for

4    the most part.  That's one, four, eight, nine, 10.

5        DEPUTY COMMISSIONER WOLK:  Are you working

6    one now?

7        INMATE LEWIS:  I'm always working four and

8    10.  And that's constantly taking an inventory of

9    my behavior and when I find that I've violated

10   someone's feelings or done something I'm quick to

11   admit to my faults now.  That is something that has

12   taken, you know, I got so caught up in that man

13   thing that it took me quite some time to be able to

14   apologize.  And so that's been a big deal in my

15   life, the ability to go to someone and say I'm

16   wrong and I feel bad about it.

17       DEPUTY COMMISSIONER WOLK:  I note also that

18   you participated in Cairos.  What did you take from

19   Cairos?  Do you still participate in Cairos?

20       INMATE LEWIS:  I'm still in Cairos.

21       DEPUTY COMMISSIONER WOLK:  What's the

22   primary thing that you can say that you get from

23   Cairos?

24       INMATE LEWIS:  The big thing, I've learned

25   how to hug.  You know, I'm more trusting.  There

26   was this community of people from the outside that

27   came in and let me know that I was not alone and a

54

1    big part of Cairos is hugging. We're this hugging

2    community, and so it was a very, you know, being a

3    somewhat hardened individual for a while, it took

4    me a while to get used to people hugging me and me

5    hugging especially males. But now I don't have any

6    problems in showing outward affection and hugging

7    and so this is -- I've accepted the fact, and I

8    have for quite some time, that there is a power

9    greater than mine, and I strive to it. Cairos,

10   some of the letters that you receive are from

11   Cairos members. I get visits from Cairos people.

12   And so, and this has been going on, I went through

13   Cairos in 1990. And the same people who were at my

14   table then, I am still in communications with them.

15   So I never lost that contact and I continue to this

16   day.

17         DEPUTY COMMISSIONER WOLK: Thank you.

18         PRESIDING COMMISSIONER LAWIN: How do you

19   reconcile your statement to me earlier that you've

20   been clean and sober since 1981 with your 1986

21   possession of marijuana 115?

22         INMATE LEWIS: Well, I had been. I mean,

23   even though I was caught with some marijuana, and

24   it was mine, I tried to make a little profit there.

25         PRESIDING COMMISSIONER LAWIN: So you had it

26   to sell rather than use?

27         INMATE LEWIS: I had a few nickel bags that

55

1    a guy had given me, tried to get me some groceries,

2    before I can get the groceries.  That was a bad

3    mark, but I officially stopped using in 1981.  I

4    woke up one day after a bad experience.  I was in

5    San Quentin.  I had messing with something I

6    shouldn't have been messing with.  And once it was

7    over I made a decision.  And since then I've never,

8    and I've been tested I don't know how many times

9    since then.  There was always something going on in

10   this environment that they will bring a bottle to

11   you because someone else is in violation.  So if

12   you lived in the housing unit or a dorm or if they,

13   so what they would do, they would bring everybody

14   to a situation, give everybody a bottle.  I don't,

15   when I tell you that I haven't used since '81, this

16   is true, I have not used.

17          PRESIDING COMMISSIONER LAWIN:  You went

18   through Cat T, didn't you?

19          INMATE LEWIS:  Cat T, yes.

20          PRESIDING COMMISSIONER LAWIN:  Was that a

21   benefit to you?

22          INMATE LEWIS:  I think it was.  I think it

23   was.  This was I think back during '85, '86, and

24   the person who ran the group, she left within the

25   last couple of years, Dr. (indiscernible).  And

26   even though I went back to Quentin for a couple

27   years, I came back.  I was still in contact with

56

1    her and so -- Any therapy is good.  Any therapy is

2    good.  I've lived in a situation where it retards

3    your growth any time you -- This is my personal

4    opinion, that if you lived in a small controlled

5    environment, if you're not careful it's going to

6    stunt your growth.  It arrests your development and

7    so I've guarded against that.  You know, it's like

8    any plant or animal or anything else, if you put

9    them in a small environment they will stay small.

10   They will not grow and so this has been a concern

11   of mine because I see it.  I can see the

12   retardation in a lot of these guys' development.  I

13   mean I could probably, no one goes through this

14   experience unaffected, nobody.  And so one of the

15   things I constantly guard against is having my

16   growth retarded or stunted in any way.  And so any

17   therapy, any time I'm given tools to deal with my

18   situation, I love it.  I mean, it helps me.  It

19   helps me see.  It makes my world a lot brighter.

20   It gives me something to work with.

21          PRESIDING COMMISSIONER LAWIN:  Thank you.

22   Counsel, any questions of your client?

23          ATTORNEY STRINGER:  I just wanted to --

24   Thank you, Commissioner.  Mr. Lewis, if you were

25   granted a date and a condition of your parole was

26   that you participate in Alcoholics Anonymous or

27   Narcotics Anonymous for the duration of your

57

1    parole, would you do that?

2        INMATE LEWIS:  Yes, it's in my plan to stay

3    plugged in.

4        ATTORNEY STRINGER:  And you'd acquire a

5    sponsor and go to meetings?

6        INMATE LEWIS:  Yes.

7        ATTORNEY STRINGER:  And if given the

8    opportunity to again enroll in San Francisco State

9    University, you would take that opportunity?

10        INMATE LEWIS:  As soon as it's open.  The

11    door has been left open.  I've received several

12    letters since.  When I couldn't make my enrollment,

13    I got a, there's a project, Project Rebound, that

14    helps people like myself.  And so I've heard, I've

15    gotten several letters from them saying that the

16    door is open and it's just a matter of filling out

17    the proper papers for another grant, a Federal

18    grant, and that whole thing.  But I don't think it

19    will be as hard this time as it was the initial

20    time.  That since everything is in order, so to

21    speak, that my transcripts and everything is in

22    place and I am qualified.  I have the necessary

23    requirements to get into an undergraduate program.

24    So I don't think it would be as difficult.

25        ATTORNEY STRINGER:  And finally, as you're

26    aware and the Board's aware, you have a disturbing

27    criminal history, but as you sit before the Board

58

1   now, Dr. Collins has described you as a, quote,

2   "rehabilitated person," which is unusual for a

3   psychologist or psychiatrist to put in a report.

4   How did you earn that particular status?  How are

5   you now a rehabilitated person?

6           INMATE LEWIS:  My thought processes are not

7   the same.  When I came, my name used to be Charles.

8   When I came here I was Charles.  Now I'm like OG or

9   Pops or Chuckie Baby.  There's all kinds of those

10  names in here.  But I really don't know that guy

11  who came in here.  I mean I have actually, that was

12  that little child in my life.  And I've put that

13  child in his place.  He's no longer in charge of my

14  life.  And so I've taken deliberate pain to correct

15  all that I thought, all that I could see, all that

16  I was made aware of, I've taken deliberate pain to

17  correct those things.  I have created a lot of,

18  I've hurt a lot of people.  I've hurt a lot of

19  people.  I had an excellent wife.

20          ATTORNEY STRINGER:  Thank you.  Thank you,

21  Commissioner.

22          PRESIDING COMMISSIONER LAWIN:  Closing

23  please, Mr. Stringer.

24          ATTORNEY STRINGER:  A few years ago I sat

25  before the Board of Prison Terms and argued that

26  Mr. Lewis was in fact a rehabilitated individual

27  and was in fact deserving of a parole date.  At

59

1    that time the Board agreed with me.  The Governor

2    did not.  But in the interim between the time the

3    Board granted the date, the Governor took the date,

4    and as Mr. Lewis sits before you now, he is still a

5    rehabilitated individual.  And the law that the

6    Board makes decisions on suggests that Mr. Lewis is

7    not at this point an unreasonable risk of danger to

8    society.  That standard was recently echoed in the

9    In re Irving Sheppard case out of Santa Clara

10   County in which the judge indicated there must be,

11   quote, "some evidence supporting the decision on

12   the basic issue before the Board, namely whether

13   petitioner would pose an unreasonable risk if

14   released now," and now is underlined.  I think that

15   question has been answered by the counselor, by Mr.

16   Lewis, and by the psychologist.  Dr. Collins

17   indicates, as I have said, that if rehabilitation

18   is possible for any felon, Mr. Lewis qualifies as a

19   rehabilitated person.  That consensus is also

20   echoed by Counselor Coehlo who indicates in 2003

21   that Mr. Lewis would pose a, quote, "low degree of

22   threat to the public if found suitable for parole."

23   The Board Report that is an Addendum does not make

24   a threat assessment, so it's logical to assume that

25   whoever prepared that addendum agreed with the

26   counselor in 2003.  Mr. Lewis' institutional

27   behavior after 1981 has been exemplary.  He has

60

1    participated in every program available to him

2    within the institutions.  He has attained some

3    academic credentials and is short only minimum

4    credits from attaining his Bachelor's Degree.  But

5    I think one of the telling points that the Board

6    can use in evaluating Mr. Lewis' character as he

7    sits before you now is the fact that he does sit

8    with ill and dieing people, and that does show some

9    real compassion for those that are less fortunate

10   than himself.  He works with visually impaired

11   people, and also works with youth.  His parole

12   plans are good.  He will have additional assistance

13   from Social Security and probably SSI.  So the

14   Board could be assured that he would both have a

15   residence and would have adequate funds to support

16   himself if given a release date.  In short, the law

17   is clear under Powell, Ramirez, and Rosencrantz

18   that the Board must have some evidence before it in

19   order to deny a person a date, that a person after

20   a period of time, as evidenced in the Biggs

21   Decision in the Ninth Circuit Court of Opinion does

22   acquire a liberty interest in a parole date and a

23   due process right in gaining that date.  Therefore

24   under the existing law we would ask and request

25   that the Board reaffirm what the Board has already

26   done, and that is to grant Mr. Lewis a date, a

27   tentative date, reaffirm it as a whole Board, and

61

1    we would ask that the Board ratify that decision

2    not only on the basis of law, but on the basis that

3    I think it's an old adage within the prisons that

4    you earn your way into prison, but you also earn

5    your way out.  And Mr. Lewis has earned his way

6    out.   Thank you.

7          PRESIDING COMMISSIONER LAWIN:   Thank you.

8    Mr. Lewis, this is your opportunity to tell us why

9    you believe you are suitable for parole.

10         INMATE LEWIS:   I have accepted full

11   responsibility for what I have done and I am

12   remorseful.  I deeply regret what I've done.  I

13   haven't wasted my time.  I think I have something

14   to offer and if found suitable again, not that I

15   would set out to make either of you proud of me,

16   but I think I'm ready.  I think I've found the

17   gift.

18         PRESIDING COMMISSIONER LAWIN:   Thank you.

19   We appreciate your comments.  We'll take a recess.

20   You can go out with the officers and we'll bring

21   you back when we have a decision.

22               R E C E S S

23               --o0o--

24

25

26

27

62

1              CALIFORNIA BOARD OF PRISON TERMS

2                     D E C I S I O N

3          DEPUTY COMMISSIONER WOLK:  We're on record.

4          PRESIDING COMMISSIONER LAWIN:   Thank you.

5     All parties have returned to the room in the

6     hearing for Charles Lewis.   Mr. Lewis, the Panel

7     has reviewed all information received from the

8     public and relied on the following circumstances in

9     concluding that you are suitable for parole and

10    would not pose an unreasonable risk of danger to

11    society or a threat to public safety if released

12    from prison.   I do want to point out, make it very

13    clear, Mr. Stringer, that this is a separate

14    decision.   This is not a reaffirmation of any prior

15    decision.   Our duty today was to conduct a parole

16    suitability hearing and we have done that.   So it

17    is separate from any other prior decision that was

18    rendered.   Mr. Lewis has enhanced his ability to

19    function within the law upon release through

20    participation in educational programs.   He had his

21    GED prior to coming into CDC.   He has a high school

22    diploma.   He has acquired his AA degree and is very

23    close to completing his Bachelor's.   He has

24    enhanced his ability to function on the outside

25    through institutional job assignments, specifically

26    a previous assignment in furniture factory.   He

27    CHARLES LEWIS    B-83314    DECISION PAGE 1    9/15/04

63

1    also has served as a clerk in a variety of areas

2    and this has certainly enhanced his ability to

3    function on the outside.  He has also acquired

4    skills actually through his developing disability.

5    He has acquired the ability to assist others who

6    are visually impaired and has mastered the various

7    pieces of equipment that are used.  He has also

8    learned Braille to some degree.  He has had a

9    stable social history as exhibited by his stable

10   relationship with his wife of 38 years.  The Panel

11   is very aware of the fact that he had an unstable

12   social history to the extent that he was previously

13   a drug user and had prior criminal history, but he

14   did have a very stable relationship with his wife,

15   long term relationship.  He has matured and grown

16   over the years.  He has greater understanding of

17   not only the commitment offense and has shown signs

18   of remorse in that regard, but he also understands

19   the nature and magnitude of the offense and he

20   accepts responsibility for his criminal behavior.

21   I want to point out for the reader of this

22   transcript that we are fully aware of the fact that

23   Mr. Lewis did not speak to this Panel about the

24   crime.  He did talk to us about his remorse.  The

25   Panel has taken the information from a variety of

26   transcripts.  There are some 15 transcripts that we

27   CHARLES LEWIS    B-83314    DECISION PAGE 2    9/15/04

64

1  reviewed, had for our review, as well as decisions

2  that have been rendered previously.  So we had the

3  ability to read all those and thus have received a

4  lot of information about the inmate's insight into

5  the commitment offense.  He also has advanced age.

6  Although he's young in years, 62, he has, that does

7  count as advanced age in terms of recidivism, and

8  it does reduce his probability of recidivism.  He

9  has realistic parole plans, which include placement

10  in a structured environment where he will be able

11  to transition back into society.  This structured

12  environment provides counseling as well as

13  assistance in permanent future housing and in

14  various social services.  And as we indicated

15  earlier, there have been five 115s during his

16  incarceration, but the Panel believes he has

17  maintained positive institutional behavior and this

18  certainly indicates significant improvement in

19  self-control.  And that conclusion is drawn from

20  the fact that he has not received a 115 since 1986,

21  a very long period of disciplinary free behavior.

22  The most-recent psychiatric evaluation is dated

23  March 17th, 2004.  It's by Dr. Gary Collins,

24  C-O-L-L-I-N-S.  It appears to support release.  The

25  inmate states, excuse me, the doctor states, if

26  past prior criminal behavior alone predicted future

27  **CHARLES LEWIS   B-83314   DECISION PAGE 3   9/15/04**

65

1    re-offense, one would conclude Mr. Lewis is a

2    dangerous person.  But just as Ms. Lloyd wrote, Mr.

3    Lewis is a complex human being.  Despite the

4    availability of alcohol and drugs in prison, it has

5    been over 10 years since there is a record of Mr.

6    Lewis using any mind-altering drug.  Much of his

7    criminal behavior was associated with membership in

8    a drug dealing and using culture.  The above facts

9    in this case reduce the violence potential to low

10   during a parole period in this writer's opinion.

11   Mr. Lewis must maintain a commitment to sobriety if

12   he is to avoid criminal behavior.  His behavior in

13   prison for many years suggests that if

14   rehabilitation is possible for any felon he

15   qualifies as a rehabilitated person.  The prior

16   report was done by Raymond Crawford,

17   C-R-A-W-F-O-R-D, and it was essentially an Addendum

18   to the Report previous that.  That Report is dated

19   June 30th, 1999.  It is a lengthy Report and it was

20   prepared -- I thought I had the end marked -- and

21   it is a 42 page Report.  It was prepared by

22   Lawrence B. Sullivan, S-U-L-L-I-V-A-N.  The doctor

23   wrote in that Report that it must therefore be

24   assumed that his risk of violence and parole

25   maladjustment are decidedly less than in his

26   earlier years.  There are both positive indicators

27   CHARLES LEWIS    B-83314    DECISION PAGE 4    9/15/04

66

```
 1    regarding reduced risk of violence, that he has
 2    programmed in a positive manner, he has shown
 3    notably positive attitudes, and again has positive
 4    programming.  The base life offense of which the
 5    prisoner has been convicted is murder, Penal Code
 6    Section 187.  The offense occurred on September
 7    26th, 1976.  The term is derived from the matrix
 8    located in the CCR Title 15 at Section 2282B, First
 9    Degree Murder Committed on or Before November 7th,
10    1978.  The Panel finds that Category One C is
11    appropriate in that death was apparently not
12    immediate.  The victim was a crime partner, thus he
13    was an accomplice in a prior commitment, or rather
14    incident.  The victim in this case had apparently,
15    informed on the inmate and the third crime partner
16    to the authorities.  The Panel assesses 156 months
17    for the base offense, notes that this is the middle
18    term.  There is additional time added for prior
19    offenses.  Prior prison term is the robbery, that's
20    Penal Code Section 211.  The prior release date was
21    June 18th, 1971, and the reception date November
22    8th, 1966.  The Panel assesses 36 months.  There is
23    a prior felony conviction that concluded with
24    probation.  That was dated December 9th, 1960, it
25    was for kidnapping and rape.  Those are Penal Code
26    Sections 207 and 261 -- I forgot to write that
27    CHARLES LEWIS    B-83314   DECISION PAGE 5    9/15/04
```

67

1    down. Both of them are Alameda County and the

2    Panel assesses six months for those prior offenses.

3    Excuse me, I need to clarify that Penal Code

4    Section -- 261, 207 and 261. Therefore, the base

5    life term is 156 months. The additional time for

6    prior prison term, 36 months. Prior felony

7    conviction, six months, for a total term of 198

8    months. Post-conviction credit is granted from the

9    date the life term began, November 18th, 1977, to

10   today's date, September 15th, 2004, for a total of

11   88 months. This is four months for every year

12   without a 115. Total period of confinement, 110

13   months. The Panel imposes the following special

14   conditions of parole. First of all, Mr. Lewis, you

15   will not use or possess alcoholic beverage and you

16   will submit to alcohol testing. This is due to

17   your prior use of alcohol. You will submit to

18   anti-narcotic testing and to THC testing and

19   participate in a substance abuse program, as an

20   example, AA or NA. And again, these conditions are

21   placed due to your use of various illegal

22   substances. We also impose that you will report to

23   Parole Outpatient Clinic for an evaluation. This

24   is due to your lengthy incarceration. And you

25   already have plans to return to Alameda County, so

26   there is no necessity for transferring you to

27   **CHARLES LEWIS    B-83314    DECISION PAGE 6    9/15/04**

68

1  another county.  You know the steps.  You know what

2  has to be done.  This has to go through decision

3  review.  And then assuming we have dotted the I's

4  and crossed our T's correctly, it will go on then

5  to the Governor's Office.  He does have the

6  authority to reverse, uphold, let this date stand,

7  or send it back to the full Board for an en banc

8  review.  I have no idea what will happen once it

9  reaches the Governor's Office.  I wish you good

10  luck.

11        INMATE LEWIS:  Thank you both.  Thank you.

12        DEPUTY COMMISSIONER WOLK:  You're welcome.

13        PRESIDING COMMISSIONER LAWIN:  You have done

14  an outstanding program and your participation, one

15  thing I didn't note and I meant to, I'm sorry, was

16  your lengthy participation in various self-help

17  programs, particularly the Pastoral Care Program,

18  the Cairos, VOLT, AA, Meditation and Stress

19  Reduction, and those are just the most recent.  But

20  that participation in the Pastoral Care Program is

21  not only one that benefits many other people, we

22  understand how it benefits you, but it's also a

23  very difficult one.  And you're to be commended for

24  your ongoing participation in that program.  Good

25  luck to you.

26        DEPUTY COMMISSIONER WOLK:  The best of

27  CHARLES LEWIS    B-83314    DECISION PAGE 7    9/15/04

69

1  everything to you.

2          INMATE LEWIS:  Thank you.

3          PRESIDING COMMISSIONER LAWIN:   That

4  concludes this hearing.  It's 10 o'clock.

5                      --oOo--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23  PAROLE GRANTED

24  THIS DECISION WILL BE FINAL ON:_____JAN 1 3 2005_____

25  YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26  DATE, THE DECISION IS MODIFIED.

27  CHARLES LEWIS   B-83314   DECISION PAGE 8    9/15/04

70

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, PATRICIA RICCI, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total two in number and cover a total of pages numbered 1 through 69, and which recording was duly recorded at CALIFORNIA MEDICAL FACILITY, at VACAVILLE, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of CHARLES LEWIS, CDC Number B-83314, on SEPTEMBER 15, 2004, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated September 30, 2004, at Sacramento County, California.

Patricia Ricci
Patricia Ricci
Transcriber
**CAPITOL ELECTRONIC REPORTING**